IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| REV. AUGUSTUS SIMMONS ENOCH, <br><br> Plaintiff <br><br> vs. <br><br> DAVID PERRY, J. SAWTELLER, BYER, LISA LAMOREAUX, SUTTERLANDER, LPN JANE DOE, DEPUTY SECRETERY TREVOR WINGARD, TRACY SMITH, REV. ULRICH KLEMM, DEBRA RAND, DAN LEE, ROBERT LAWRENCE MAXA, KIMBERLY SMITH, GARY PRINKEY, KATHLEEN HILL, BONNE E. BELL, ANDREW LESLIE, HEATHER KELLERMAN, CHAPPLON REV. SHAFFER, CHAPLLON REV. SIBANDA, <br><br> Defendants | 1:19-CV-00026-RAL <br><br> RICHARD A. LANZILLO <br> CHIEF UNITED STATES MAGISTRATE JUDGE <br><br> SUPPLEMENTAL MEMORANDUM OPINION ON DOC DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES AS TO COUNTS IV-VI OF AMENDED COMPLAINT <br><br> IN RE ECF NO. 155 |

I. Introduction

In its prior opinion and order (ECF Nos. 214, 215), the Court resolved all issues raised in the DOC Defendants' motion for summary judgment (ECF No. 155) except their exhaustion of administrative remedies defense to Plaintiff Simmons' religious free exercise and accommodation claims at Counts IV-VI of his Amended Complaint.[1] Based on the limited record before it, the Court concluded that it could not determine whether Simmons had exhausted his administrative remedies as to Counts IV-VI. Specifically, the Court found that ambiguities in the language and

---

[1] The DOC Defendants are David Perry, J. Sawteller, Deputy Secretary Trevor A. Wingard, Tracy Smith, Rev. Ulrich Klemm, Debra S. Rand, Dan Lee, Kimberly Smith, Gary Prinkey, Kathleen Hill, Bonne E. Bell, Heather Kellerman, Rev. Shaffer, and Rev. Sibanda.

1

history of the DOC's religious accommodation policy, DC-ADM 819, and its general grievance policy, DC-ADM 804, required an evidentiary hearing to determine whether the DOC's administrative remedies regarding inmates' presentation of religious accommodation requests was "so opaque that it [had] become[], practically speaking, incapable of use" as the Supreme Court contemplated in *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

The Court conducted the evidentiary hearing on December 18, 2024. Based on the entire record, including the evidence adduced at the evidentiary hearing, the Court finds that Simmons failed to exhaust his available administrative remedies as to his religious accommodation claims and that Defendants are therefore entitled to summary judgment on Counts IV-VI of the Amended Complaint.

II. Simmons' Religious Accommodation Claims

Simmons' religious accommodation claims are based on a religion that he founded while in prison. He alleges that "on August 7th 2016, Plaintiff Rev. Magi Augustus Osiris Enoch [Simmons], was ordained by the light of elohim (The light of the creator, the creator) to be the first herald of light in this new age to pave the path of righteousness and truth now known as the Fellowship of Spiritual Science." ECF No. 68, ¶ 57. Simmons claims that several of the DOC Defendants violated his First Amendment right to freely exercise his religion (Count IV), conspired to violate that right (Count V), and violated his rights under the RLUIPA, 42 U.S.C. § 2000cc *et seq*. (Count VI). Count IV targets DOC Defendants Wingard, T. Smith, Klemm, Rand, Shaffer, and Sibanda.[2] *Id.*, ¶ 74. Wingard, the Deputy Secretary of the DOC, has final decision-making authority concerning inmate requests for religious accommodations submitted pursuant to DC-ADM 819. Sibanda is the chaplain at SCI-Greene. T. Smith, Klemm, Rand, and Shaffer are

---

[2] This Count is anchored in the allegations of paragraphs 57-93 of the Amended Complaint. *See* ECF No. 68, p. 74.

members of the Religious Accommodations Committee. Simmons alleges that each of these DOC Defendants had a role in denying his requests for religious accommodations, which included weekly access to a science journal, the return of several religious books, including the *Prophesies of Nostradamus* and the "*Rig Vidas*," access to a prayer rug, a non-beef diet, and a religious name change. *Id.* ¶¶ 68-95. He also alleges that Shaffer "refused to accommodate plaintiff's religious practices when he refused to advise the STGMU staff that [Simmons'] books ... were religious and necessary to practice his religion" and that Shaffer also prevented Simmons from giving religious lectures to other inmates and "advocated strongly against" his requested religious diet. *Id.*, ¶ 75.

At Count V, Simmons claims that DOC Defendants Shaffer, Sibanda, Klemm, T. Smith, Rand, and Wingard conspired to violate his First Amendment free exercise rights by denying him a "religious box" accommodation. *Id.*, ¶ 63. Simmons states that this exemption is needed to "hold his religious books, research, and materials in accordance with the eye of Odysseus." *Id.*, ¶¶ 64-65. He indicates that the "Chaplain department" denied his request but does not identify any of the named DOC Defendants as taking any specific action to deny him a religious box. Finally, at Count VI, Simmons claims the restrictions imposed by Shaffer, Sibanda, Klemm, T. Smith, Rand, and Wingard "substantially burdened" his ability to practice his religion in violation of the RLUIPA. *Id.*, ¶ 66.

III. The DOC Defendants' Request for Summary Judgment Based on Simmons' Failure to Utilize the DC-ADM 804 Grievance Process

On summary judgment, the DOC Defendants argued that the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, bars Counts IV-VI of the Amended Complaint because Simmons failed to exhaust his administrative remedies under DC-ADM 804 as to each. The only grievance identified in the record relating to Simmons' religion claims is grievance no. 783640. *See* ECF

3

No. 158-7, pp. 1-10. There, Simmons complained that on "1-27-2019 I was unable to complete my religious book for the Fellowship of Spiritual Science called Magnus Manifesto …." *Id.*, p. 1. Simmons asserted that the completion of this text "was necessary as an exhibit" in another lawsuit he had pending in this Court. *Id.* But in response to the DOC Defendants' concise statement of material facts, Simmons acknowledged that this grievance is "not relevant too [sic] this complaint." ECF No. 166, ¶ 32. No other grievance in the record relates to Simmons' religious accommodation or associated constitutional rights, the denial of which he challenges at Counts IV, V, and VI. Thus, if DC-ADM 804 is a mandatory administrative remedy procedure for these claims, they are not exhausted.

 IV. Simmons' Completion of the DC-ADM 819 Religious Accommodation Request Procedure

 Simmons argued that his completion of the "Religious Accommodation Request" process outlined in DC-ADM 819 "satisf[ies] the PLRA exhaustion requirements" and that further resort to DC-ADM 804's grievance procedure was unnecessary. ECF No. 167, p. 7, ¶ 20. He contended that "DC-ADM 819 requires all religious accommodation claims to be raised through the religious accommodation process; this remedy replaces the necessity of the grievance system and exhausts any and all religious claims made through this administrative process." *Id.*, ¶ 21. Simmons' religious accommodation requests are part of the record. *See* ECF No. 167-3. As detailed below, Simmons pursued his accommodations through each step specified by DC-ADM 819.

 Pursuant to DC-ADM 819(C), an inmate seeking a religious accommodation, such as a special religious diet, or other matter not related to personal grooming must submit a Non-Grooming Religious Accommodation Request form to the Facility Chaplaincy Program Director ("FCPD"). *See, generally,* ECF No. 167-2. This form requires the inmate to state the name of their religion, the type of accommodation requested, the key teachings and practices of their faith,

4

a description of the requested accommodation, how they practice their faith in prison, and a list of sacred texts, references, or sources that support the requested accommodation. DC-ADM 819(C). *See also, e.g., Nye v. Klemm*, No. 2023 WL 6819993, at *2 (W.D. Pa. Oct. 10, 2023). According to the policy, the first step in requesting a "non-grooming" religious accommodation is submission of a "Religious Accommodation Request Form—Non-grooming Form." ECF No. 167-2, p. 63 (DC-ADM 819, Section 4(C)). The FCPD then must schedule an interview with the inmate within twenty working days regarding the request. *Id. See also Hall v. Klemm*, 2017 WL 913954, at *2 (W.D. Pa. Feb. 1, 2017), *report and recommendation adopted*, 2017 WL 913803 (W.D. Pa. Mar. 7, 2017). After interviewing the inmate, the FCPD makes a recommendation whether to grant the request and circulates that recommendation to various departments within the facility—including the Major of the Guard, Corrections Care Program Manager, and Facility Manager—for their approval. *Id.* After the FCPD's recommendation is circulated, it is forwarded to the Central Office for a final determination by the Religious Accommodation Review Committee ("RARC"). *Id.* Following the RARC meeting, the Bureau of Treatment Services ("BTS") prepares a formal suggested response to the inmate's request, which is subject to the approval of the Regional Deputy Secretary. *Id.* The final decision is sent to the FCPD, who then provides the inmate a copy of the final decision letter. *Id.*

On April 12, 2018, Simmons filed a non-grooming religious accommodation request. ECF No. 167-3, p. 2. He asked that his religion "be recognized on the religious change form and within the Department of Corrections; that he be provided with a specific diet;" that his twice-daily meditative prayer be "conducted with ritualistic food items via snack bag;" that he receive "seven food items while in the prayer of union;" that he be permitted to celebrate several feast days accompanied by special foods; that he be permitted access to a science journal; and that he be

provided a "substitute for his spiritual mat, and an official and active address for a ankh pendant." *Id.* pp. 3-17.

His initial request for these accommodations was received by the FCPD on April 18, 2018. *Id.*, p. 2. Simmons did not provide the Court with the entire record of this accommodation request, but he did submit the final decision by Deputy Secretary Trevor Wingard on August 23, 2018. *Id.*, p. 19. That document shows that the BTS staff informed the institution of the final decision on August 28, 2018, and the FCPD sent Simmons a copy of the decision on that same day.[3] *Id.*

V. While the interplay between DC-ADM 819 and DC-ADM 804 is subject to multiple differing interpretations, the scheme they create is not so opaque that an ordinary prisoner cannot discern or navigate it.

Simmons argues that his prosecution of his religious accommodation requests through a final decision under DC-ADM 819 accomplished all that was necessary to exhaust those claims in accordance with the PLRA. He asserts that "[i]t would be redundant to file a grievance in response to this denial [of religious accommodations] for the same employees from the religious accommodation review would respond to the grievance." ECF No. 68, ¶ 105. For purposes of the DOC Defendants' motion for summary judgment, the Court accepts Simmons' assertion that he genuinely believed that he only needed to complete the process specified in DC-ADM 819 to exhaust administrative remedies regarding his religious accommodation claims. The Court also views Simmons' interpretation of DC-ADM 819 as reasonable. The plain language of this policy dictates a multi-step process for inmates to request accommodation of their religious practices and pursuant to which those requested accommodations are evaluated against concerns for security and

---

[3] Most of Simmons' requested accommodations were denied. ECF No. 167-3, pp. 18-19. However, he was told that he may purchase a prayer mat and ankh pendant when "the security phase he is in allows for such a purchase" and that he may "write the name of his religion next to the category OTHER on the Religious Preference Form." *Id.*, p. 19.

6

the orderly administration of the facility. *See* DC-ADM III (Policy Statement). DC-ADM 819 does not include any language advising inmates that they must initiate and exhaust the DC-ADM 804 grievance process if they are dissatisfied with the final decision of the Deputy Secretary.[4]

The PLRA requires that prisoners exhaust such administrative remedies as are "available" before challenging the conditions of their confinement in court. The circumstances under which an administrative remedy is "unavailable" include where it is "so opaque that it becomes, practically speaking, incapable of use…". *Ross*, 578 U.S. at 643. "In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. at 643-44. This a relatively high bar. The fact that an administrative remedy policy is subject to multiple reasonable interpretations concerning what an inmate must do to exhaust remedies does not make them "unavailable" under *Ross*. "The procedures need not be sufficiently 'plain' as to preclude any reasonable mistake or debate with respect to their meaning." *Id*. at 644 (citations omitted). Instead, "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id*. The remedy is unavailable in this context, only when it is "'essentially "unknowable'—so that no ordinary prisoner can make sense of what it demands…". *Id*. (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007) (citing *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir 2008) ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available")).

---

[4] DC-ADM 819 also does not include any opportunity to appeal or otherwise challenge a decision by the Deputy Secretary. But this omission sheds little light on the issue before the Court. On the one hand, the absence of any right of appeal under DC-ADM 819 can be viewed as indicating the finality of the religious accommodation evaluation process and exhaustion of the administrative remedy. On the other hand, it can be seen as a signal to the inmate that any further challenge must be raised by another means—specifically, a grievance under DC-ADM 804.

The record does not support a finding that the administrative remedies and procedures stated in DC-ADM 819 and DC-ADM 804 are unknowable. The steps an inmate must take under each policy are plainly stated. In fact, the record includes evidence that Simmons has previously navigated the procedures of both DC-ADM 819 and DC-ADM 804. *See* ECF No. 167. Simmons' argument, instead, focuses on the lack of clarity concerning whether an inmate must also exhaust DC-ADM 804's grievance process after receiving an unsatisfactory decision at the conclusion of the DC-ADM 819 religious accommodation request process. The DOC Defendants contend that an inmate must exhaust DC-ADM 819's elaborate multi-step process for addressing requests for religious accommodations—a process that involves DOC personnel with special expertise in religious matters and that culminates in review by the Deputy Secretary of the DOC—and then must file a grievance challenging the Deputy Secretary's decision before a relatively low-level prison grievance coordinator pursuant to DC-ADM 804. This sequence is not specified in either DC-ADM 819 or DC-ADM 804. And, to a certain extent, it is counter intuitive.

The DOC's position is also somewhat problematic when examined against the regulatory history of DC-ADM 819. The version of this policy adopted by the DOC in 2006 included a provision specifying that "[g]rievances may only be submitted after the inmate has received notification of the decision on the requested accommodation." *See* DC-ADM 819-03 § VI.G.2.g (effective Mar. 3, 2006); *Scott v. Erdogan,* 2016 WL 4154939, at *6 (M.D. Pa. Aug. 4, 2016). This sentence was omitted from the version of DC-ADM 819 adopted by the DOC in 2013,[5] which was in effect when Simmons pursued his religious accommodations. Rev. Ulrich Klemm, the current Religious Services Administrator, Division of Treatment Services, explained that this

---

[5] In its prior Opinion, the Court stated that the sentence was omitted from DC-ADM 819 in 2016. Rev. Klemm testified that the omission occurred in 2013 and was part of substantial rewrite of DC-ADM 819.

8

omission was a part of a complete revision to the DC-ADM 819 and was not intended to imply that inmates no longer had to exhaust the DC-ADM 804 process before filing suit over a denial of a religious accommodation request. But the fact remains that the DOC's removal of this provision may reasonably be read as doing precisely that.[6]

There is also precedent for finding that a subject-specific administrative process may provide an alternative to DC-ADM 804 to exhaust administrative remedies. Specifically, district courts have held that DC-ADM 001 provides "an alternative means" for inmates to exhaust claims based on allegations of assault. *Muriente-Vega v. Pancoast*, 2023 WL 3393537, at *4 (W.D. Pa. Feb. 17, 2023), *report and recommendation adopted*, 2023 WL 3394581 (W.D. Pa. May 11, 2023); *Pirl v. Ringling*, 2021 WL 1964461, at *11 (W.D. Pa. Mar. 29, 2021) (collecting cases), *report and recommendation adopted*, 2021 WL 498453 (W.D. Pa. Sept. 15, 2021). These courts have noted that "DC-ADM 001 lacks the strict filing provisions of DC-ADM 804, including the time for filing—DC-ADM 001 has no time limit for reporting abuse" and "provides multiple ways for inmates to report abuse: he can report it verbally or in writing to any staff member, file a DC-ADM 804 grievance, or report it in writing to the Department's Office of Special Investigations and Intelligence (OSII)." *Pirl*, 2021 WL 1964461, at *7 (quoting *Moore v. Lamas*, 2017 WL 4180378, at *3 (M.D. Pa. Sept. 21, 2017) (citing DC-ADM 001 at 1-1) (internal footnote omitted)). These courts have also noted that "[i]n all cases, an investigation ensues and is conducted either by the Security Office or OSII," "DC-ADM 001 includes detailed provisions as to the timing, content and review of investigations," and "provides the manner in which the inmate is to be notified of

---

[6] The omission of this provision may reasonably be read to mean that the DC-ADM 804 process still applies to inmate concerns regarding religious accommodations, but inmates need no longer wait until the DC-ADM 819 process has been completed before submitting a grievance. This interpretation, however, appears unreasonable as it would allow inmates to invoke the grievance process to preempt or forego DC-ADM 819's elaborate multi-step process for addressing requests for religious accommodations.

9

the results of the investigation...." *Id.* In holding that resort to DC-ADM 804 grievance procedures is not required to exhaust claims of abuse, these courts have emphasized that "DC-ADM 001 expressly provides an inmate with three alternative avenues to notify the DOC of an assault," including the filing of a grievance. *Pirl*, 2021 WL 1964461, at *12. In contrast to DC-ADM 001, however, DC-ADM 819 does not include any language to support that it serves as an alternative to DC-ADM 804.

Several other factors also support the DOC's position. DC-ADM 804 is intended to deal with a wide range of issues, procedures, or events that may be of concern to an inmate." DC-ADM 804.1.A.2. It is the general procedure to challenge most adverse decisions and other aspects of prison life, and where the DOC has elected to exempt certain complaints or concerns from the DC-ADM 804's grievance procedures, it has done so expressly. DC-ADM 804 § 1.A.7 states, for example:

> Issues concerning a specific inmate misconduct charge, conduct of hearing, statements written within a misconduct and/or other report, a specific disciplinary sanction, and/or the reasons for placement in administrative custody will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 801, "Inmate Discipline" and/or DC-ADM 802, "Administrative Custody Procedures." Issues other than specified above must be addressed through the Inmate Grievance System.

DC-ADM 804 § 1.A.7. *See also* DC-ADM 804 § 1(A)(6) ("A grievance regarding sexual abuse will not be addressed through the Inmate Grievance System and must be addressed through Department policy DC-ADM 008") (*discussed in Ricciardi v. Shumencky*, 2018 WL 1251834, at *4 (M.D. Pa. Mar. 12, 2018)). Significantly, DC-ADM 804's list of excluded subjects does not include denials of requests for religious accommodation.

DC-ADM-804 also requires an inmate to supply certain information that would not be disclosed as part of the DC-ADM 819 religious accommodation request process. It specifies that

10

a grievance must "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; it must "identify individuals directly involved in the event(s)" and "specifically state any claims [the inmate] wishes to make concerning violations of Department directives, regulations, court orders, or other law"; and identify "the specific relief sought," including "compensation or other legal relief normally available from a court." DC-ADM 804 § 1(A)(11). In this respect, DC-ADM 804 is designed to elicit information to address past or ongoing violations of rights and deviations from DOC policy committed by prison personnel and the remedies that the inmate is seeking through the grievance process or that the inmate may seek in subsequent litigation. In contrast, DC-ADM 819 is designed to provide an informed process for addressing an initial "request" for religious accommodation; it is not a procedure to raise concerns about past violations of rights and deviations from policy.[7] This distinction supports the DOC Defendants' position that DC-ADM 819 is the avenue for inmates to request a religious accommodation while DC-ADM 804 provides a process to challenge the denial of such a request as a prerequisite to filing a lawsuit.

Rev. Klemm has been employed by the DOC in various capacities since 2004 and has knowledge of the DOC's application of DC-ADM 804 and DC-ADM 819. He participates directly in the religious accommodation request process and reviews grievances following the denial of such requests. He testified that once the Deputy Director issues his decision pursuant to DC-ADM 819, an inmate who is dissatisfied with the decision has no further recourse or right of appeal under that regulation. Instead, the inmate may file a grievance under DC-ADM 804. He further explained

---

[7] There is at least one reported case where the plaintiff-inmate utilized the DC-ADM 804 grievance process to address a religious freedom claim, see *Johnson v. Wireman*, 2019 WL 1383575, at *15 (M.D. Pa. Mar. 27, 2019), *aff'd in part, vacated in part on other grounds, remanded*, 809 Fed. Appx. 97 (3d Cir. 2020), but that case did not even mention DC-ADM 819 or the interplay between it and DC-ADM 804.

that the grievance process allows for the correction of possible mistakes, misunderstandings, or procedural errors during the DC-ADM 819 process. He also testified that he has personally participated in reviewing grievances filed after decisions of the Deputy Secretary under DC-ADM 819 and that he has personally been involved in at least one instance where the grievance resulted in a determination contrary to the Deputy Secretary's decision.

Michael Bell is a long-time employee of the DOC and a current grievance review officer of the Secretary's Office of Inmate Grievances and Appeals. He similarly testified that any inmate who is dissatisfied regarding the outcome of a religious accommodation request under DC-ADM 819 is required to grieve their concerns or objections under DC-ADM 804 to satisfy the PLRA's exhaustion requirement. He also identified other DOC policies which, like DC-ADM 819, do not expressly reference DC-ADM 804 but under which inmates must exhaust the DC-ADM 804 process if dissatisfied with a decision. These policies include DC-ADM 812 regarding visitation requests, DC-ADM 203 regarding cell searches, DC-ADM 610 regarding food services and diet requests, and DC-ADM 815 regarding inmate property. For each of these policies, an inmate dissatisfied with its application is required to exhaust DC-ADM 804's grievance and appeal steps to comply with the PLRA's exhaustion requirement.

The record includes no evidence that any other inmate has failed to recognize the need to file a DC-ADM 804 grievance if dissatisfied with the Deputy Secretary's religious accommodation decision. Nor is there record evidence of any "systemic confusion," such as the United States District Court for the Middle District of Pennsylvania found regarding the DOC's policies to address allegations of sexual abuse. *See Moore v. Lamas*, 2017 WL 4180378, at *10 (M.D. Pa. Sept. 21, 2017) (holding that in addition to DC-ADM 804, DC-ADM 001 was an appropriate

12

method of exhaustion of abuse claims given the "systemic confusion" that existed regarding which policy applied to such claims).

As the foregoing discussion demonstrates, both Simmons and the DOC Defendants' interpretation of the interplay between DC-ADM 819 and DC-ADM 804 are reasonable. In certain contexts, ambiguous provisions are construed against the drafter. *See Giammetta Assocs., Inc. v. J.J. White, Inc.*, 573 F. Supp. 112, 113 (E.D. Pa. 1983) (construing against the drafter an ambiguous contract provision limiting a party's right to sue). But here, the PLRA mandates the opposite. "When an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross*, 578 U.S. at 644 (citation omitted). Therefore, the Court must construe the ambiguity that exists between the parties' two reasonable interpretations in favor of exhaustion of both the religious accommodation request process of DC-ADM 819 and the grievance process of DC-ADM 804.

VI. Conclusion

Distinguishing between acceptable ambiguity and unnavigable opacity can itself be an exercise of uncertainty. An inmate reading DC-ADM 819 and its highly specific treatment of requests for religious accommodation could reasonably conclude that it, rather than the more general grievance process outlined in DC-ADM 804, is the process that must be exhausted to ripen a claim under the PLRA. At the same time, an inmate familiar with both policies could reasonably understand that he or she must exhaust both in succession.[8] Case law directs that when faced with uncertainty, inmates should err on the side of exhaustion. In this case, that approach required Simmons to pursue and exhaust his grievance remedies under DC-ADM 804 after the denial of his

---

[8] A single sentence added to DC-ADM 819 specifying that an inmate who is dissatisfied with the Deputy Director's decision has the right to contest the decision through the DC-ADM 804 grievance process would obviate future confusion.

13

religious accommodation request under DC-ADM 819. Because the record demonstrates that Simmons failed to exhaust his available administrative remedies under DC-ADM 804 as to the claims asserted in Counts IV, V, and VI of the Amended Complaint, the DOC Defendants are entitled to judgment as a matter of law as to those claims. A supplemental Judgment Order will be issued separately.

DATED this 6th day of January, 2025.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE